UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Mary Agourrame,

    Plaintiff,

v.

CUNA Mutual Group, *et al.*,

    Defendants.

Case No. 2:05cv1006

Judge Michael H. Watson

## OPINION AND ORDER

Before the Court are the following:

1. The August 24, 2006 Motion of Defendant CUNA Mutual Insurance Society (hereinafter "Defendant" or "CUNA") for Judgment as a Matter of Law on the Administrative Record (Doc. 18). Plaintiff Mary Agourrame (hereinafter "Plaintiff") filed a Memorandum in Response on September 22, 2006 (Doc. 23).

2. The August 24, 2006 Motion of Plaintiff for Judgment as a Matter of Law (Doc. 20). Defendant filed a Memorandum in Response on September 22, 2006 (Doc. 22). Defendant Midstate Educators Credit Union Inc. Long Term Disability Plan (hereinafter "Plan") filed a Memorandum in Response (Doc. 24).[1]

---

[1] In its September 26, 2006 Memorandum in Response (Doc. 24), Defendant Plan incorporates the arguments set forth in CUNA's Reply (Doc. 22) to Plaintiff's Motion for Judgment on the Administrative Record. Moreover, the Court notes that while Doc. 24 is hyperlinked on the docket sheet to Doc. 18, it should be linked to Doc. 20.

3. The October 13, 2006 Motion of Plaintiff to Strike (Doc. 25) the September 22, 2006 Memorandum (Doc. 22) of CUNA in Response (Doc. 24). Defendant CUNA filed a Memorandum in Opposition on November 3, 2006 (Doc. 26). Plaintiff filed a Reply Memorandum on November 17, 2006 (Doc. 27). Only motions to strike matters from pleadings are recognized by the rules. See Fed.R.Civ.P. 12(f). A motion is not a pleading. Therefore, a motion to strike is inapplicable to a motion for judgment. Accordingly, the October 13, 2006 Motion of Plaintiff to Strike (Doc. 25) the September 22, 2006 Memorandum (Doc. 22) of Defendant CUNA in Response (Doc. 24) is hereby **DENIED**.

Plaintiff brings this action against Defendants CUNA and the Plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), for denial of long-term disability benefits. For the reasons stated herein, Defendants' Motion for Judgment as a Matter of Law on the Administrative Record (Doc. 18) is hereby **GRANTED** and Plaintiff's Motion for Judgment as a Matter of Law (Doc. 20) is hereby **DENIED**.

I. **FACTS**

Plaintiff began working as a collector for the Midstate Credit Union, Inc. (hereinafter "Midstate") on March 21, 2001. (C0034, C0446.)[2] At Midstate, a collector "contacts holders of delinquent loan accounts" and "[p]repares regular reports and summaries of delinquent account activity." (C0041.)

---

[2] The Administrative Record was bate stamped CUNA 0001- CUNA 0601. Citations to the record have been abbreviated to "C", followed by the page number.

Through her employment with Midstate, Plaintiff became a participant in the Plan, insured by CUNA. (C0004.) Disability income benefits for persons who are "Totally Disabled"[3] are available under the Plan. (C0010.)

Plaintiff's policy under the Plan became effective on September 1, 2002. (C0446.) Any "diagnosis" between June 1, 2002 and September 1, 2002 is considered a "Pre-Existing Condition" under the policy. (C0028, C0446.)

On July 18, 2002, Plaintiff awoke in the middle of the night with pain and throbbing in her right foot. (C0137.) She visited Dr. Jeffrey E. Gittens, an orthopedic foot and ankle surgeon, on July 31, 2002. (C0137-38.) Plaintiff complained to Dr. Gittens of right foot pain and he assessed that she had synovitis of the right ankle. He directed her to wear a postoperative boot and to not bear weight on her foot. (C0138.) Plaintiff saw Dr. Gittens again on August 27, 2002. (C0135.) She told the doctor her pain persisted. Dr. Gittens assessed that Plaintiff has "synovitis of the right ankle as well as subtalar joint." He noted that Plaintiff had a "rheumatoid work up" which "came out to be negative."

On September 6, 2002, Dr. Gittens evaluated Plaintiff and reviewed her MRI. (C0136.) He believed she had "chronic ongoing right ankle pain" and was uncertain whether Plaintiff had synovitis. Dr. Gittens was still uncertain of Plaintiff's condition on September 27, 2002. (C0134.) He made arrangements for her to see Dr. David Stainbrook, a rheumatologist.

---

[3]"Totally Disabled" and "Pre-Existing Condition" are specifically defined terms in the Plan. Their definitions are set forth later in this Opinion.

Dr. Stainbrook evaluated Plaintiff on October 15, 2002. (C0230.) At that time, Plaintiff was found to have "right ankle and foot pain with MRI showing evidence of osteophytosis, plantar fasciitis, calcaneal spur, peroneus brevis tendonitis, minimal degeneration of the posterior tibial tendon, interior talofibular ligament strain, and talofibular . . . ." (C0229.)

On November 5, 2002, Plaintiff followed up with Dr. Stainbrook. (C0231.) He noted, among other things, Plaintiff had rheumatoid arthritis. Plaintiff filled out a Patient Assessment form the same day. (C0143.) She indicated on the form she could dress, get in and out of bed, lift a glass to her mouth, wash and dry her entire body, and turn regular faucets on and off without any difficulty. Plaintiff noted she had some difficulty getting a good night's sleep, getting in and out of cars, walking outdoors on flat ground, and bending down to pick up clothing from the floor. She further noted she had much difficulty walking two miles and participating in sports and games as she would like.

Plaintiff followed up with Dr. Gittens on November 8, 2002. (C0215.) He noted that Plaintiff had "some pain on motion of the ankle" at that time but it was "somewhat improved." On January 10, 2003, Plaintiff reported to Dr. Gittens that pain was also developing in her left ankle. (C0214.) Dr. Gittens assessed that Plaintiff had rheumatoid arthritis in her ankles.

On February 4, 2003, Dr. Stainbrook evaluated Plaintiff. (C0116.) At that time, Dr. Stainbrook found Plaintiff had rheumatoid arthritis, plantar fasciitis with right calcaneal spur, tendonitis of the right ankle, positive rheumatoid factor, and thoracic muscular pain. He noted Plaintiff felt "both good and bad." Plaintiff told Dr. Stainbrook that "overall she feels better but she is still having some trouble with ankle swelling,

right wrist and fingers bothering her, and bilateral shoulder discomfort." She indicated on a Patient Assessment form that she could dress, lift a glass to her mouth, wash and dry her entire body, turn regular faucets on and off, get in and out of a car, and get a good night's sleep without any difficulty. (C0120.) She noted some difficulty getting in and out of bed, walking outdoors on flat ground, and bending down to pick up clothing from the floor. She further noted she had much difficulty walking two miles.

On March 13, 2003, Plaintiff telephoned Dr. Stainbrook's office. (C0117.) Her message relayed her pain was getting worse, she was missing a lot of work because of her pain, and she could not function.

Dr. Beth T. Tranen, Plaintiff's regular physician, wrote a letter[4] dated March 14, 2003, indicating Plaintiff's therapy for rheumatoid arthritis caused the Plaintiff nausea, vomiting, and fatigue. (C0267.) She opined that Plaintiff "may frequently be forced to miss work due to the severity of her symptoms."

On May 6, 2003 Dr. Stainbrook evaluated Plaintiff. (C0228.) Plaintiff stated to Dr. Stainbrook that "she is not as well as she would like to be" and"[h]er energy level is low and last week she had pain all over." Dr. Stainbrook diagnosed Plaintiff with rheumatoid arthritis, right calcaneal spur, and positive rheumatoid factor. He recommended medication to Plaintiff and noted, with Dr. Tranen's permission, he would like to follow up with her in three months.

Plaintiff filled out another Patient Assessment form on May 6, 2003. (C0109.)

---

[4]On the face of the letter, it is not apparent to whom the letter is addressed. However, due to the nature of the letter, it appears that it was most likely written to the Plaintiff's employer, Midstate.

She indicated she was feeling poorly and experiencing pain. She also noted she could lift a glass to her mouth, wash and dry her entire body, turn regular faucets on and off, get in and out of a car, and get a good night's sleep without any difficulty. She reported some difficulty dressing, getting in and out of bed, and walking outdoors on flat ground. She further noted much difficulty bending down to pick up clothing from the floor, walking two miles, and participating in sports and games as she would like.

On June 12, 2003, Dr. Tranen filled out a Certificate to Return to Work. (C0219.) She stated that due to Plaintiff's rheumatoid arthritis and treatment, effective June 13, 2003, Plaintiff was placed "on medical disability for approximately 6 months depending on progress made with her medical condition."

Four days later, on June 16, 2003, Plaintiff presented for treatment with Dr. Sterling Hedrick. (C0256.) He opined that her condition was more consistent with diffuse fibromyalgia and that she may have a low-grade form of rheumatoid arthritis. He noted her symptoms consisted of diffuse discomfort about the knees, ankles, hands and shoulders, that she had a "puffy sensation" in her hands, "much stiffness and much fatigue," and that her sleep was "variable."

On July 10, 2003, Dr. Hedrick wrote that Plaintiff had "diffuse periarticular tenderness throughout the upper and lower extremities." (C0217.) He opined that her "clinical findings are more predominantly those of diffuse fibromyalgia."

On July 28, 2003, Dr. Hedrick followed up with Plaintiff. (C0255.) He noted she continued "with significant particular tenderness throughout the upper and lower extremities in a fibromyalgia pattern." He noted "her sleep remains problematic and she has much fatigue." Dr. Hedrick saw Plaintiff again on September 8, 2003 and

November 10, 2003. (C0254.) On the latter day he noted Plaintiff "continues with significant periarticular tenderness throughout the upper and lower extremities consistent with fibromyalgia."

On August 1, 2003, Richard Maslyk of Midstate filled out a CUNA form in regard to Plaintiff. (C0444.) He indicated that Plaintiff's doctor advised that she might be frequently forced to miss work. Therefore, Plaintiff was "offered a position where such frequent absences would be tolerable." (C0444-45.)

On August 19, 2003, Plaintiff filled out a form indicating the duties of her employment were typing, lifting, moving, and filing and that she was unable to lift, file, and type. (C0443.) She indicated the pain and inflammation of her joints, stress, and fatigue caused her to stop working.

Dr. Tranen filled out a CUNA form in regard to Plaintiff on November 24, 2003. (C0260.) She noted on the form that her primary diagnosis of Plaintiff was rheumatoid arthritis and her secondary diagnosis was fibromyalgia. She noted Plaintiff's subjective complaints included "pain, fatigue, weakness, nausea." She reported Plaintiff's condition had regressed but she expected fundamental changes in the Plaintiff's medical condition in six to twelve months. She noted that Plaintiff's functional capacity was severely limited and she was incapable of minimum (sedentary) activity. Dr. Tranen also indicated she had not reviewed Plaintiff's job description or Plaintiff's self-report of job tasks. She stated Plaintiff was unable to work due to chronic pain and fatigue.

On December 23, 2003, Behavioral Management, Inc. (hereinafter "BMI") notified Dr. Tranen that CUNA retained BMI to review Plaintiff's disability claim.

(C0252.)

Dr. Mark Johnson of BMI reviewed Plaintiff's file and sent a report to CUNA on January 2, 2004. (C0449, C0351.) Dr. Johnson reviewed Drs. Tranen's and Stainbrook's notes. (C0351-52.) It is unclear from Dr. Johnson's report whether he reviewed Dr. Gittens's notes.[5] Dr. Hedrick's notes were not provided to Dr. Johnson. (C0351.) Dr. Johnson also spoke with Dr. Tranen. (C0352.) He asked Dr. Tranen about "the low functional state" she indicated for [Plaintiff] in her Attending Physician's Statement, signed November 24, 2003. (C0352.) Dr. Tranen stated that at that time in November, "she must have felt [Plaintiff] was limited from a sedentary job but since she ha[d] not seen her in over a month, she d[id] not know if [Plaintiff] [wa]s still impaired from a sedentary position." (C0352-53.)

On January 15, 2004, CUNA denied Plaintiff's Long Term Disability claim because her "limitations of functioning from [her] condition [did] not preclude work activity in [her] occupation as a collector." (C0346.) This conclusion was "based upon a comparison of [Plaintiff's] limitations as outlined by [her] physician and as documented in [her] medical records information to the formal job description for [her] position." In addition to CUNA's review of the information provided, CUNA based its decision on Dr. Johnson's report which stated:

> There is no objective medical evidence in the record to show that [Plaintiff] is impaired to such a degree that she is medically unable to perform a sedentary occupation.

---

[5] Dr. Johnson briefly referred to Dr. Gittens in his report: "She complained of foot pain in 7/02 and was sent to Dr. Gittens, whose specialty is not known. She was placed in a walking boot, but this did not appear to help her very much and interfered with her driving." (C0351-52.)

* * *

> [Plaintiff] may or may not have Fibromyalgia, and if she does, a program of regular aerobic exercise is generally recommended. Maintaining gainful employment is generally regarded as therapeutic. In the absence of any contraindication to work, and in the absence of any indication that Ms. Agourrame has a condition that would be substantially aggravated by working, she should continue to work. Her job duties are sedentary, and there is no medical evidence that she has any condition or any combination of medical conditions, that would prevent her from performing a sedentary or light duty occupation.

(C0347.)

CUNA further noted it "received no proof that [Plaintiff is] unable to perform the substantial duties of [her] occupation due to limitations of functioning when met with reasonable accommodations."

On March 1, 2004, Plaintiff followed up with Dr. Hedrick. (C0257.) He noted "[s]he tried Celebrex without benefit" and that she was taking other medications. He also noted Plaintiff's "shoulders are tender and lack about five degrees of abduction, left more than right." He stated Plaintiff was "still with low-grade diffuse fibromyalgia and tenderness as well."

Plaintiff appealed CUNA's decision denying her application for long-term disability benefits on October 28, 2004. (C0087.)

CUNA requested Dr. Elinor Mody prepare a report on Plaintiff. (C0070.) Dr. Mody reviewed the notes of Drs. Tranen, Gittens, Stainbrook, and Hedrick. She also reviewed other documents relating to Plaintiff's condition. Dr. Mody did not examine Plaintiff. Dr. Mody submitted her report to CUNA on December 28, 2004.

Dr. Mody's report noted she spoke with Dr. Tranen on December 17, 2004. (C0071.) Dr. Mody reported that Dr. Tranen told her that "the current treatment plan is to continue to treat [Plaintiff] for fibromyalgia and encourage her to be active."

Dr. Mody opined that Plaintiff's primary diagnosis was fibromyalgia. (C0070.) Based on the medical data provided and her conversation with Dr. Tranen, Dr. Mody reported Plaintiff was treated for fibromyalgia and/or rheumatoid arthritis between June 1, 2002 and September 1, 2002, even though she was not diagnosed with the conditions at that time. (C0071.) Dr. Mody concluded,"[f]rom a rheumatologic objective point of view, limitations of [Plaintiff's] activities of daily living are not present." She noted in a Medical Consultant Review-Estimation of Physical Capacities that Plaintiff has the ability to "lift, carry or exert force up to 10 pounds/4.45 kilograms maximum and occasionally carry small objects." (C0073.) In that report she marked that Plaintiff was not restricted in any extremity function due to her condition.

On January 18, 2005, the CUNA ERISA Appeals Review Committee reconvened to review Plaintiff's Long Term Disability benefits claim. (C0449.) On January 20, 2005, CUNA notified Plaintiff her claim had been denied. CUNA based its decision on the information that Plaintiff provided for her initial claim, information provided after the initial claim, other medical records, and the opinions of Drs. Johnson and Mody. CUNA noted:

> Dr. Mody's review found that [Plaintiff] was not functionally limited by her condition with the exception of lifting over 10 pounds was restricted by her condition. However, as [Plaintiff] was not required to lift over 10 pounds as a material or substantial duty of her occupation, this is not grounds for disability.

Furthermore, CUNA indicated the additional information provided revealed Plaintiff's condition was a pre-existing condition and thus excluded from coverage. (C0451.) CUNA determined that the treatment for ankle pain from June 1, 2002 to September 1, 2002 was treatment for the conditions for which she was subsequently diagnosed.

## II. STANDARD OF REVIEW

An ERISA administrator's denial of benefits under a plan is subject to *de novo* review unless the plan grants the administrator discretionary authority either to determine benefits or construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 103 (1989). If the plan grants the administrator such discretion, the denial of benefits is subject to a highly deferential arbitrary and capricious standard of review. *Firestone*, 489 U.S. at 115. Here, Plaintiff expressly concedes the Plan grants the administrator discretion and that the Plan administrator's decision is subject to the arbitrary and capricious standard of review (Doc. 23, p. 2).

"[T]he arbitrary and capricious standard is the least demanding form of judicial review of administrative action." *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). A decision regarding eligibility for benefits is not arbitrary and capricious if it is "rational in light of the plan's provisions." *Daniel v. Eton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988). Stated differently, "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (internal quotations and citation omitted). The administrator's decision must be upheld if "it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of Am. Health and Ret. Funds*,

929 F.2d 1140, 1144 (6th Cir. 1991). The Sixth Circuit explained the standard of review further in *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378-79 (6th Cir. 2005):

> Nevertheless, merely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions. As we observed recently, '[t]he arbitrary-and-capricious . . . standard does not require us merely to rubber stamp the administrator's decision.' *Jones v. Metropolitan Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (citing *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)). Indeed, "[d]eferential review is not no review, and deference need not be abject." *McDonald*, 347 F.3d at 172. Our task at all events is to 'review the quantity and quality of the medical evidence and the opinions on both sides of the issues.' *Id.*

The Sixth Circuit has recognized that an actual conflict of interest exists when an insurer both decides whether an employee is eligible for benefits and pays those benefits. *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, 527 (6th Cir. 2003). "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115 (1989) (quoting Restatement (Second) of Trusts § 187, cmt. d (1959)).

In the instant case, CUNA decides whether a claimant is eligible for benefits and pays those benefits. A conflict of interest therefore exists which must be considered as a factor when applying the abuse of discretion standard. The Court will consider and weigh this factor.

**III. ANALYSIS**

    A. <u>Plaintiff's Condition is not a Pre-Existing Condition</u>

CUNA contends Plaintiff's fibromyalgia and/or rheumatoid arthritis is a Pre-Existing Condition and thus not covered under the Plan. The Plan defines a Pre-

Existing Condition as a "diagnosed . . . Subjective Disorder for which You received Treatment within three (3) months prior to your effective date." (C0015.) The Plan does "not cover any period of Total Disability . . . which is caused or contributed to by, or results from a Pre-Existing Condition . . . ." (C0028.)

CUNA argues Plaintiff's condition is not required to be diagnosed prior to the effective date in order to be Pre-Existing. Instead, CUNA asserts an employee need only receive treatment prior to the effective date for symptoms attributable to a later diagnosed condition. CUNA claims that because Plaintiff received treatment for certain symptoms prior to the effective date and was subsequently diagnosed with fibromyalgia and/or rheumatoid arthritis, Plaintiff's condition was Pre-Existing under the Plan.

CUNA also argues that if the Pre-Exiting Condition provision is ambiguous, the plan administrator has discretionary authority to resolve conflicts between ambiguous terms. As such, CUNA maintains it was rational to consider Plaintiff's condition as Pre-Existing. In support, CUNA relies on *Smiljanich v. General Motors Co.*, 182 Fed. Appx. 480, 2006 U.S. App. LEXIS 13969 (6th Cir. 2006). In *Smiljanich*, a conflict existed between two pages of the benefits booklet. *Id.* at 486. The *Smiljanich* court held the administrator had discretion to resolve the conflict noting "plan administrators who are vested with discretion in determining eligibility [are granted] great leeway in interpreting ambiguous terms." *Id.* (citation omitted).

In response, Plaintiff argues her condition was not Pre-Existing because it was not diagnosed within the stated time period.

Interpretation of the definition of Pre-Exiting Condition is guided by "[g]eneral rules of contract interpretation." *See Rodriguez v. Tenn. Laborers Health and Welfare*

*Fund*, 89 Fed. Appx. 949, 953, 2004 U.S. App. LEXIS 2067 (6th Cir. 2004) (citing *Hunter v. Caliber Sys. Inc.*, 220 F.3d 702, 712 (6th Cir. 2000)). Disputed plan provisions are interpreted according to their plain meaning under these rules. *See id.* (citing *Williams v. Int'l Paper Co.*, 227 F.3d 706, 711 (6th Cir. 2000)). Provisions will be deemed ambiguous if they are "subject to more than one reasonable interpretation." *See id.* (citing *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1376 (6th Cir. 1994)).

Currently, there is no ambiguity since the plain meaning of the contested provision supports only Plaintiff's interpretation. The straightforward reading of the definition of Pre-Existing shows that the treatment referred to must have been for a diagnosed Subjective Disorder. Plaintiff's disorder was not diagnosed at the time of any treatment she received prior to the effective date. Therefore, she did not receive treatment for a diagnosed disorder (fibroymalgia and/or rheumatoid arthritis) prior to the effective date. Thus, Plaintiff's condition was not Pre-Existing as defined by the Plan.

    B.    CUNA's Decision to Deny Plaintiff's Claim was not Arbitrary and Capricious

    *1. Interpretation of the Plan Provisions*

CUNA's decision regarding Plaintiff's eligibility for benefits must be "rational in light of the plan's provisions." *See Daniel*, 839 F.2d at 267. The parties disagree over the interpretation of the Plan's provisions. The following is the language of the policy which governs this case:

**Material and Substantial Duties** means duties that:

1. are normally required for the performance of Your Own Occupation or any occupation; and
2. cannot be reasonably omitted or modified except that We will consider You able to perform the Material and Substantial

> Duties if You are working or have the capacity to work 40 hours per week.
>
> * * *
>
> **Subjective Disorder** means . . . Fibromyalgia . . . and any and all disorders that cannot be documented by specific test results or objective findings.
>
> * * *
>
> **Total Disability or Totally Disabled** means during the Elimination Period and the next 36 months of disability You are unable to perform, with reasonable accommodation, all of the Material and Substantial Duties of You Own Occupation because of Injury, Sickness, Mental/Nervous Disorder, Substance Abuse, or Subjective Disorder.
>
> * * *

(C0014, C0016.)

> Under the Plan, the insured must give proof of their claim, which must cover:
>
> 1. the date of total disability or partial disability stated;
> 2. the cause of Total Disability or Partial disability;
> 3. the degree of total disability or Partial disability; and
> 4. Objective documentation of the Total Disability or Partial Disability including test results and office and Treatment notes.

(C0018.)

Accordingly, CUNA argues the Plan requires Plaintiff to establish that she suffers from an injury, sickness, mental/nervous disorder, substance abuse, or subjective disorder, as well as provide objective documentation that she is unable to perform her duties as a collector because of her condition.

In contrast, Plaintiff argues the Plan provisions specifically provide for the payment of benefits due to total disability as a result of a subjective disorder, which Plaintiff maintains is a *"disorder that cannot be documented by specific tests or*

*objective findings*." Plaintiff further claims that denying benefits based upon a claimed lack of objective evidence is essentially rewriting the Plan, excluding coverage for subjective disorders for which the Plan, as written, explicitly provides coverage.

Upon consideration, the correct interpretation of the Plan is advanced by CUNA. While it is true that the Plan provides benefits for a disability resulting from a subjective disorder which cannot be evidenced by objective findings, the Plan still requires objective documentation of total disability, *i.e.*, that Plaintiff is unable to work because of her subjective disorder. This requirement is clear under the Plan. Therefore, the Plan requires Plaintiff provide objective evidence that her disorder renders her totally disabled.

Plaintiff cites to *Pelchat v. UNUM Life Ins. Co. Of America*, 2003 U.S. Dist. LEXIS 8095 (N.D. Ohio Mar. 25, 2003) and *Crist v. Liberty Life Assurance Co. of Boston*, 2006 U.S. Dist. LEXIS 26326 (S.D. Ohio May 4, 2006) to support her position that objective evidence of disability is not required under the Plan. However, the plans at issue in *Pelchat* and *Crist* do not require the same evidence of disability as CUNA's Plan. See *Crist*, 2006 U.S. Dist. LEXIS 26326 at *46 ("nowhere does the Policy require 'clinical medical evidence'"); see *Pelchat*, 2003 U.S. Dist. LEXIS 80995 at *32 (the policy at issue "d[id] not condition benefits on clinical evidence of the existence of the condition that renders a claimant disabled").

> 2. *The Administrative Record is not Devoid of Support for CUNA's Decision*

CUNA's decision denying Plaintiff's benefits was not arbitrary and capricious because it was "rational in light of the plan's provisions." See *Daniel*, 839 F.2d at 693.

The decision was "the result of a deliberate, principled reasoning process and . . . supported by substantial evidence." See Baker, 929 F.2d at 1144.

In Wages v. Sandler O'Neill & Partners, L.P., 37 Fed. Appx. 108, 110, 2002 U.S. App. LEXIS 3535 (6th Cir. 2002), the employee had been diagnosed with fibromyalgia. The employee submitted a claim for disability benefits under an insurance policy which was provided to her by her employer. Id. at 109-10. The plan administrator denied the employee's claim. Id. at 110-11.

The Sixth Circuit affirmed the district court's finding that the insurance company's decision was rational. Id. at 113. The court noted that "after what appear[ed] to have been a thorough examination of the administrative record" the insurance company concluded that the employee "had not shown that she lacked the functional capacity to perform her admittedly sedentary job." Id. The court also noted that although two doctors indicated that the employee's "fibromyalgia precluded even the lightest work, neither doctor quantified the [employee's] functional limitations in terms of the number of hours she could sit or stand comfortably, or the like." Id. Furthermore, when the employee submitted her claim for permanent disability one of the doctors' office notes indicated that the employee was 'being followed for a relatively mild fibromyalgia type syndrome.' Id. A subsequent letter from the doctor "failed to recommend that the company grant total disability benefits, and . . . implied that the [employee] might be physically able to return to work." Id. The "only doctor to timely fill out a functional capacity report, indicated that the plaintiff was mentally capable of functioning in her job." Id. The court concluded that "the administrative record [was] not devoid of support for [the insurance company's] decision." Id.

Similarly, after a thorough examination of the administrative record, CUNA concluded Plaintiff failed to show that she lacked the functional capacity to perform her sedentary job. This conclusion is based on substantial evidence. First, like in *Wages*, correspondence from Dr. Tranen failed to recommend that CUNA grant total disability benefits, and implied that the plaintiff might be physically able to return to work. The June 12, 2003 Certificate to Return to Work placed Plaintiff "on medical disability for approximately [six] months depending on progress made with her medical condition." (C0219.) Also, the November 24, 2003, CUNA form filled out by Dr. Tranen noted that Plaintiff's condition had regressed, but that Dr. Tranen expected fundamental changes in the Plaintiff's medical condition in six to twelve months. (C0260.) Further, in response to Dr. Johnson's inquiry about the low functional state Dr. Tranen indicated for Plaintiff in the November 24, 2003 report, Dr. Tranen stated that at the time of the report she must have felt Plaintiff was limited from a sedentary job, but since she had not seen her in over a month, she did not know if Plaintiff was still impaired from a sedentary position. (C0352-53.)

In addition, neither Drs. Hedrick, Gittens, nor Stainbrook opined as to whether Plaintiff was disabled. Drs. Johnson and Mody reviewed the records provided by Plaintiff and determined she was able to perform her sedentary job.

Further evidence which supports CUNA's decision is Dr. Mody's report. When speaking with Dr. Mody on December 17, 2004, Dr. Tranen informed Dr. Mody that the current treatment plan was to treat Plaintiff for fibromyalgia and encourage Plaintiff to be active. (C0071.) Like in *Wages*, Dr. Tranen did not "quantif[y] the plaintiff's functional limitations in terms of the number of hours she could sit or stand comfortably,

or the like." Based on the medical data provided and her conversation with Dr. Tranen, Dr. Mody concluded limitations of Plaintiff's activities of daily living were not present. (C0071.) Additionally, she noted Plaintiff's ability to lift, carry or exert force up to a maximum of ten pounds, and occasionally carry small objects. (C0073.) Dr. Mody marked that Plaintiff's condition did not restrict any extremity function.

Finally, similar to the "relatively mild fibromyalgia type syndrome" which the *Wages* court noted, Dr. Hedrick's March 1, 2004 record classified Plaintiff's fibryomalgia as "low-grade." (C0257.) Considering all the facts, CUNA's decision was based on substantial evidence.

### 3. ERISA does not Require that Greater Deference be Given to Treating Physicians

Plaintiff argues CUNA's reliance on the opinions of two "independent" paper reviewers, rather than physicians who actually evaluated her, to determine whether her fibromyalgia rendered her unable to perform her own occupation is arbitrary and capricious. Plaintiff cites *Meyer v. Metropolitan Life Ins. Co.*, 341 F. Supp. 2d 865 (S.D. Ohio 2004) to support this position. *Meyer* states:

> [I]f the conclusion of a treating physician is not supported by objective or documented, reasoned analysis . . . the opinion is entitled to little weight. At the same time, a non-examining physician is limited to reviewing and accepting documented findings and testings performed by a treating physician. Accordingly, [the non-examining physician's] opinion has evidentiary weight only to the extent that it is based upon objective testing provided by [the treating physicians].

*Id.* at 872.

Currently, there is no indication that Drs. Johnson and Mody did not base their opinions on the findings and testings performed by Plaintiff's treating physicians. To

the contrary, both Drs. Johnson's and Mody's reports expressly indicated their opinions were based on documentation provided by Plaintiff's treating physicians. (C0070, C0351-52.) Even more, they both spoke with Dr. Tranen. As discussed above, Dr. Tranen failed to recommend that CUNA grant total disability benefits and implied that Plaintiff might be physically able to return to work. Furthermore, "[i]t is now clear that 'plan administrators are not obliged to accord special deference to the opinions of treating physicians.'" *Bishop v. Metro. Life Ins. Co.*, 70 Fed. Appx. 305, 311, 2003 U.S. App. LEXIS 14093 (6th Cir. 2003) (citing *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 155 L. Ed. 2d 1034, 123 S. Ct. 1965, 1967 (2003)). As such, it was not arbitrary and capricious for CUNA to rely on the opinions of the non-treating physicians.

## IV. CONCLUSION

The administrative record is not devoid of support for CUNA's decision. As the record sufficiently supports CUNA's position, the conflict of interest factor does not outweigh the evidence supporting CUNA's decision. CUNA's decision was rational and was neither arbitrary nor capricious. Accordingly, the August 24, 2006 Motion of CUNA for Judgment as a Matter of Law on the Administrative Record (Doc. 18) is hereby **GRANTED** and the August 24, 2006 Motion of Plaintiff for Judgment as a Matter of Law (Doc. 20) is hereby **DENIED**.

**IT IS SO ORDERED.**

_____
Michael H. Watson, Judge
United States District Court